IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DIWANN MATHIS and MARKETA MATHIS, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-805-CFC |
| FREIRE CHARTER SCHOOL, | |
| Defendant. | |

DiWann Mathis and Marketa Mathis, Seffner, Florida, Pro Se

Kristen S. Swift, KAUFMAN DOLOWICH LLP, Wilmington, Delaware;

    *Counsel for Defendant*

**<u>MEMORANDUM OPINION</u>**

December 22, 2025
Wilmington, Delaware

_Colm F. Connolly_
COLM F. CONNOLLY
CHIEF JUDGE

Pro se Plaintiffs DiWann Mathis and Marketa Mathis have sued Defendant Freire Charter School for violating the McKinney-Vento Homeless Assistance Act (the McKinney-Vento Act or the Act) under 42 U.S.C. § 1131 *et seq.* and 42 U.S.C. § 1983, and for intentional infliction of emotional distress. D.I. 2 at 2, 4. Pending before me is Freire's motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss both claims. D.I. 10.

## I.    BACKGROUND

According to the Complaint, which I must accept as true and liberally construe in Plaintiffs' favor for the purpose of deciding this motion, Plaintiffs and their two minor children are currently "residing" at a home in Seffner, Florida. D.I. 2 at 1. Plaintiffs and their children had been "residing" in a home in Wilmington, Delaware, in September 2024. D.I. 2 at 2. The two children attended Freire at that time. Freire is a charter school located in Wilmington. D.I. 2 at 2.

On or about September 15, 2024, Plaintiffs' landlord told them that the property they were living in had been sold and gave them until October 31, 2024, to vacate the property. D.I. 2 at 2. Plaintiffs left that residence on or about October 25, 2024, and began living in a commercial property they had been leasing that was also located in Wilmington. D.I. 2 at 2. The children continued to attend

Freire. D.I. 2 at 2. Residing at the commercial property was a violation of the lease agreement, but the landlord of that property, "[o]ut of compassion for the Plaintiffs[,] . . . allowed the Plaintiffs to reside in the property until 04/01/2025, which was the end of the lease." D.I. 2 at 2.

Plaintiffs allege that they "decided to relocate to the state of Florida for a new start." D.I. 2 at 2. In anticipation of that move, on or about March 3, 2025, Plaintiffs reached out to Tyrone Hurst, an employee at Freire. Plaintiffs told Hurst that they "had been dealing with a personal hardship/homelessness" and that "due to this hardship, [their] children would not be returning to Freire Charter School, as [they] were relocating to the state of Florida." D.I. 2 at 3. Plaintiffs requested from Hurst "assistance from [Freire] regarding [their] children's ability to continue their education remotely[] using the schools['] asynchronous learning program[] until the children transition[ed] into [a] traditional school." D.I. 2 at 3.

Hurst responded that he would have to speak to the Head of School, Nathan Durant, about Plaintiffs' request. D.I. 2 at 3. The next day, Hurst informed Plaintiffs that the school was unable to provide the requested services. D.I. 2 at 3.

On or about March 13, Plaintiffs "relocated from the state of Delaware and moved to the state of Florida." D.I. 2 at 3. They arrived in Florida on March 15 and between that date and May 1, 2025, they "temporarily resid[ed] out o[f] hotels[] and Airbnb[s]." D.I. 2 at 3. During that six-week period, Plaintiffs

2

"continued to make efforts to communicate with [Freire] about providing [a] remote education curriculum for the[ir] children." D.I. 2 at 3.  According to Plaintiffs, "during this time [Freire] began engaging in coercive and retaliatory acts such as sending countless emails . . . threatening truancy actions before the court, and ultimately further threatening grade retention of [Plaintiffs'] minor children." D.I. 2 at 4.

"Eventually, [Plaintiffs] were left with no option, but to make efforts to home school the children through online resources." D.I. 2 at 3.  Plaintiffs allege that "taking the time to find grade appropriate curriculum for each of the children, downloading, printing, and grading said school work daily[] began to take a major financial and economic toll on the Plaintiffs" and caused Plaintiffs to "suffer[] significant mental, and emotional distress[] in addition to the exacerbation to the Plaintiffs['] current personal hardships [during this] time." D.I. 2 at 4.

Plaintiffs seek by their complaint $4 million in lost earnings and emotional damages, in addition to punitive damages, prejudgment interest, and costs.  D.I. 2 at 4.

## II.    LEGAL STANDARDS

A district court "may grant a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable

to the plaintiff, plaintiff is not entitled to relief." *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (internal quotation marks and citation omitted).  To state a claim on which relief can be granted, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Detailed factual allegations are not required, but the complaint must include more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  The complaint must set forth enough facts, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570.  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Deciding whether a claim is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

Because Plaintiffs proceed pro se, their pleading is liberally construed and the Complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citation omitted).

## III.    DISCUSSION

With respect to Plaintiffs' McKinney-Vento claim, Freire argues that Plaintiffs' claim is blocked by state sovereign immunity, the Act does not have a private right of action for parents, and even if the Act does create a cause of action, Plaintiffs have failed to state a claim.  D.I. 11 at 5–11.  With respect to the claim for intentional infliction of emotional distress, Freire argues that Plaintiffs have failed to allege sufficiently egregious action to constitute an actionable harm. D.I. 11 at 11–12.

### A.    The McKinney-Vento Act Claim

Assuming without deciding that the McKinney-Vento Act creates a cause of action that parents can assert on behalf of either their children or themselves and recover damages under § 1983, Plaintiffs have failed to state a claim under the Act.

The Act was enacted in 1987 "[t]o provide urgently needed assistance to protect and improve the lives and safety of the homeless."  Pub. L. No. 100-77, 101 Stat. 482.  It was reauthorized in 2002 as part of the No Child Left Behind Act. Pub. L. No. 107-110, 115 Stat. 1989.  Section 11431(a) of the Act states that it "is the policy of the Congress [that] [e]ach State educational agency shall ensure that each child of a homeless individual and each homeless youth has equal access to the same free, appropriate public education, including a public preschool education, as provided to other children and youths."  42 U.S.C. § 11431(1).  To

5

implement that policy, the Act authorizes the Secretary of Education to provide grants to states for "services and activities to improve the identification of homeless children and youths . . . and enable such children and youths to enroll in, attend, and succeed in school." § 11432(d)(2). The authorized amounts of the grants vary by state and are essentially proportional to the number of school-age children below the poverty line in each state as determined by the most recent census. *See* 42 U.S.C. § 1132(c); 20 U.S.C. §§ 6332–6335.

To receive a grant under the Act, a state must submit to the Secretary a "plan to provide for the education of homeless children and youths *within the State*." 42 U.S.C. § 11432(g)(1) (emphasis added). For the plan to be acceptable to the Secretary it must meet many requirements. Relevant here is § 11432(g)(3)(A)(i)'s requirement that the plan "describe how the State will ensure that local educational agencies in the State will . . . continue the child's or youth's education in the school of origin for the duration of homelessness—(I) in any case in which a family becomes homeless between academic years or during an academic year; and (II) for the remainder of the academic year, if the child or youth becomes permanently housed during an academic year." §§ 11432(g)(2)(A), (g)(3)(A)(i).

Plaintiffs do not identify in their Complaint what provision of the Act they maintain Freire violated. But in their opposition to Freire's motion to dismiss, they accuse Freire of violating § 11431(1) and § 11432(g)(3). D.I. 13 at 3. Plaintiffs,

6

however, have failed to state a claim that would be cognizable under the Act

because they do not allege that Freire ever denied their children access to free and

appropriate public education while they lived in Delaware and do not allege that

they or their children were ever homeless in Delaware. Plaintiffs allege that they

were homeless *in Florida* between March 15, 2025, and May 1, 2025. *See* D.I. 2

at 3. But during that time frame, neither Delaware nor any public school in

Delaware was required under the Act to provide Plaintiffs or their children with

any form of education, let alone the same free and appropriate public education

provided to other children and youths in Delaware.

The Act defines "homeless", "homeless individual", and "homeless person"

to mean

> (1) an individual or family who lacks a fixed, regular,
> and adequate nighttime residence;
>
> (2) an individual or family with a primary nighttime
> residence that is a public or private place not designed for
> or ordinarily used as a regular sleeping accommodation
> for human beings, including a car, park, abandoned
> building, bus or train station, airport, or camping ground;
>
> (3) an individual or family living in a supervised publicly
> or privately operated shelter designated to provide
> temporary living arrangements (including hotels and
> motels paid for by Federal, State, or local government
> programs for low-income individuals or by charitable
> organizations, congregate shelters, and transitional
> housing);

(4) an individual who resided in a shelter or place not meant for human habitation and who is exiting an institution where he or she temporarily resided;

(5) an individual or family who—

>  (A) will imminently lose their housing, including housing they own, rent, or live in without paying rent, are sharing with others, and rooms in hotels or motels not paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations, as evidenced by—

>>  (i) a court order resulting from an eviction action that notifies the individual or family that they must leave within 14 days;

>>  (ii) the individual or family having a primary nighttime residence that is a room in a hotel or motel and where they lack the resources necessary to reside there for more than 14 days; or

>>  (iii) credible evidence indicating that the owner or renter of the housing will not allow the individual or family to stay for more than 14 days, and any oral statement from an individual or family seeking homeless assistance that is found to be credible shall be considered credible evidence for purposes of this clause;

>  (B) has no subsequent residence identified; and

>  (C) lacks the resources or support networks needed to obtain other permanent housing; and

(6) unaccompanied youth and homeless families with children and youth defined as homeless under other Federal statutes who—

8

> (A) have experienced a long-term period without living independently in permanent housing,
>
> (B) have experienced persistent instability as measured by frequent moves over such period, and
>
> (C) can be expected to continue in such status for an extended period of time because of chronic disabilities, chronic physical health or mental health conditions, substance addiction, histories of domestic violence or childhood abuse, the presence of a child or youth with a disability, or multiple barriers to employment.

42 U.S.C. § 11302(a). And it defines "homeless children and youths" to mean

> (A) . . . individuals who lack a fixed, regular, and adequate nighttime residence (within the meaning of section 11302(a)(1) of this title); and
>
> (B) includes—
>
>> (i) children and youths who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason; are living in motels, hotels, trailer parks, or camping grounds due to the lack of alternative adequate accommodations; are living in emergency or transitional shelters; or are abandoned in hospitals;
>>
>> (ii) children and youths who have a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings (within the meaning of section 11302(a)(2)(C) [1] of this title);
>>
>> (iii) children and youths who are living in cars, parks, public spaces, abandoned buildings,

9

substandard housing, bus or train stations, or
similar settings; and

(iv) migratory children (as such term is defined in
section 6399 of title 20) who qualify as homeless
for the purposes of this part because the children
are living in circumstances described in clauses (i)
through (iii).

§ 11434a(2).

Notwithstanding the length, broad scope, and detailed nature of these

definitions, they are, as Plaintiffs note in their opposition, "without geographic

limitation."  D.I. 13 at 6.  As a result, the Act does not expressly provide that a

state's obligation "to ensure that each child of a homeless individual and each

homeless youth has equal access to the same free, appropriate public education,

including a public preschool education, as provided to other children and youths"

applies only to the children of homeless individuals and homeless youth found

within the geographic boundaries of that state.

But the fact that the Act is implemented through grants to the states that are

based on the states' proportional populations and conditioned on the submission by

each state of "plan to provide for the education of homeless children and youths

*within the State*," § 11432(g)(1) (emphasis added), makes clear that a state's

obligations under the Act are limited to the homeless children and youth found

within that state.  To hold otherwise would lead to absurd results.  *See Griffin v.*

*Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute

which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). It cannot be the case that Congress intended that, as a condition of accepting federal funding for its schools, Delaware is required to ensure that all homeless children living in all the other 49 states have equal access to the education that Delaware provides to the children who reside in Delaware. The grants awarded to the states in the 2025 fiscal year show the absurdity of Plaintiffs' position. Delaware received a grant of $423,326 to implement the Act whereas California's grant was $15,863,004 and Florida's grant was $6,783,042. *Education for Homeless Children and Youths*, U.S. Dep't of Educ, https://www.ed.gov/grants-and-programs/formula-grants/formula-grants-special-populations/education-homeless-children-and-youths#funding-status-awards [https://perma.cc/FJJ3-UHFW] (last updated Dec. 10, 2025). Thus, even putting aside logistical impracticalities, it obviously would be financially impossible for Delaware to provide homeless children in California and Florida the same free and appropriate public education it provides to children and youths in Delaware.

Plaintiffs allege they became homeless when they relocated to Florida in March and April this year. To the extent any state owed their children obligations under the Act at that time, it was Florida, not Delaware. Because Delaware owed

11

Plaintiffs' children no obligations under the Act once they relocated to Florida,

Plaintiffs cannot state a cognizable claim under the Act.[1]

### B.     The Intentional Infliction of Emotional Distress Claim

To plead a claim of intentional infliction of emotional distress under

Delaware law, a plaintiff must plausibly allege "(1) extreme and outrageous

conduct; (2) an intent to cause severe emotional distress or reckless disregard with

respect to causing emotional distress; and, (3) the conduct actually caused severe

emotional distress." *Jordan v. Delaware*, 433 F. Supp. 2d 433, 444 (D. Del. 2006)

(quotation marks and citation omitted). Plaintiffs allege that in response to their

repeated requests for remote learning services, Freire sent emails threatening

truancy action and grade retention of the minor children. D.I. 2 at 4. And they say

that Freire's actions caused them to "suffer[] significant mental, and emotional

distress." D.I. 2 at 4.

Plaintiffs' do not allege facts to support these conclusory allegations. With

respect to the allegedly coercive emails, Plaintiffs offer no details about their

contents other than to say they threatened truancy and grade retention. *See* D.I. 2

---

[1] I previously dismissed claims brought by Plaintiffs on behalf of their minor
children because a nonattorney parent proceeding pro se cannot represent or bring
claims on behalf of his or her minor child. D.I. 4 ¶ 3. For the reasons stated
above, the children would have had no cause of action under the Act against Freire
had they been represented by counsel.

at 4.  They do not plead facts about who sent them, when they were sent, or what they said.  They also do not explain the mental manifestation of their "significant" mental and emotional distress.  Even though Plaintiffs proceed pro se, I need not credit their bald "labels and conclusions."  *Twombly*, 550 U.S. at 555; *see Tusha v. Pediatric Assocs., P.A.*, 2023 WL 5932921, at *1 (D. Del. Sept. 12, 2023).  Their unsupported conclusions do not state a claim for intentional infliction of emotional distress under Delaware law.

## IV.    CONCLUSION

For the foregoing reasons, I will grant Freire's motion to dismiss.

The Court will enter an Order consistent with this Memorandum Opinion.

13